CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED
3/17/2025
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| MICHAEL S., ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 4:23-cv-00029 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| COMMISSIONER OF SOCIAL ) | By:   Hon. Thomas T. Cullen |
| SECURITY, ) | United States District Judge |
| ) | |
| Defendant. ) | |

Plaintiff Michael S. ("Michael") filed suit in this court seeking review of the Commissioner of Social Security's ("Commissioner") final decision denying his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–433, 1601–1637. Michael does not challenge the determinations related to his physical impairments; rather, his challenge focuses on alleged failures to appropriately consider his mental limitations. After a hearing, an administrative law judge ("ALJ") concluded that, despite his limitations, Michael could still perform a range of light work. Michael challenges that conclusion, calling for reversal and remand on two primary grounds. But because the ALJ considered all the evidence in the record and adequately explained her rationale for the conclusions she reached, the Commissioner's final decision will be affirmed.

### I.   STANDARD OF REVIEW

The Social Security Act (the "Act") authorizes this court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines*

*v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The court's role, however, is limited; it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted). Instead, in reviewing the merits of the Commissioner's final decision, a court asks only whether the ALJ applied the correct legal standards and whether "substantial evidence" supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 99–100 (1991)).

In this context, "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (internal quotation omitted). But "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his past relevant work (if any) based on his residual functional capacity ("RFC"); and, if not (5) whether he can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II.    RELEVANT PROCEDURAL HISTORY AND EVIDENCE

Michael filed for DIB and SSI benefits on February 6, 2020. (*See* R. 18; 226–39.) He claimed a disability onset date of June 1, 2019, resulting from myriad health issues: a stroke suffered on June 19, 2019; "brain stem"; right-leg difficulty; type-2 diabetes; severe high blood pressure; stints in his heart; high cholesterol; cardio embolic stroke; coronary arteriosclerosis; hyperlipidemia; hypertensive heart disease; paroxysmal atrial fibrillation; myocardial infarction; dysarthria; and bursitis in his right shoulder. (*See* R. 69.)  His claims were denied initially on December 21, 2020 (R. 68–111), and upon reconsideration on January 27, 2022 (R. 116–35).

Michael requested a hearing before an ALJ. (R. 165–66.) The ALJ held a hearing on March 14, 2023 (R. 44–67), and issued a written decision denying his claim on April 4, 2023 (R. 18–38). Although the ALJ found that Michael suffered from several severe impairments—

"a vascular insult to the brain, diabetes mellitus, obesity, hypertension[,] and coronary artery disease"—she determined that Michael could still perform work at the light level, with additional limitations. (*See generally id.*) Michael appealed that decision, but the Appeals Council denied his request for review, making the ALJ's written decision the final decision of the Commissioner as of September 18, 2023. (*See* R. 1–3.)

**A.      Legal Framework**

A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week, despite his medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). The ALJ makes the RFC finding between steps three and four of the five-step disability determination. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) (citing 20 C.F.R. § 404.1520(e)). "This RFC assessment is a holistic and fact-specific evaluation; the ALJ cannot conduct it properly without reaching detailed conclusions at step 2 concerning the type and [functional] severity of the claimant's impairments." *Id.*

The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by definition "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional restriction that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). The RFC should reflect credibly established "restrictions caused by medical impairments and their related symptoms"—including those that the ALJ found "non-severe"—that impact the claimant's "capacity to do

work-related physical and mental activities" on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1, *2.

Second, the ALJ's decision must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explaining how he or she weighed any inconsistent or contradictory evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC findings when he or she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and the written decision built an "accurate and logical bridge from that evidence to his [or her] conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018), *superseded by Rule on other grounds as recognized in Rogers v. Kijakazi*, 62 F.4th 872 (4th Cir. 2023) (internal quotation omitted). *See Shinaberry v. Saul*, 952 F.3d 113, 123–24 (4th Cir. 2020); *Thomas*, 916 F.3d at 311–12; *Patterson*, 846 F.3d at 662–63.

**B.      Medical Evidence**

Michael does not challenge any of the ALJ's determinations regarding his physical limitations, so the court will confine its review of the medical evidence to the limited records that bear on a determination of his mental limitations.

Michael was admitted to the hospital on June 10, 2019, complaining of right facial numbness. (R. 437.) A head CT showed "no evidence of acute or subacute ischemia. No hemorrage, mass effect, or midline shift." (R. 436.) Impressions of the radiologist included "[n]o acute finding" and "[m]oderately severe periventricular white matter signal abnormalities which are nonspecific with differential possibilities including small vessel ischemic disease,

demyelinating disease, and post infectious and inflammatory etiology." (*Id.*) Chest x-rays and an echocardiogram were also performed. (R. 439–40.) Michael was discharged on June 12 with a diagnosis of atrial fibrillation. (R. 403.)

Michael was admitted to the hospital again on June 14, complaining of "right-sided weakness." (R. 466.) A head CT showed "[m]oderate nonspecific white matter disease" and "[g]eneralized volume loss" that was "greater than expected for [his] age." (R. 467.) An MRI of his brain showed "[r]estricted diffusion . . . in the left pons consistent with an acute infarction." (R. 466.) Michael was found to have an "[a]cute left pontine infarct." (*Id.*) Michael was discharged on June 19 with a diagnosis of acute cerebrovascular accident and was sent to inpatient rehab. (R. 449.) At the time of his discharge, Michael was noted to be "alert, oriented X 3" and was noted to have normal affect, judgment, and insights. (R. 451.)

At the rehabilitation center, Michael was prescribed physical, occupational, and speech therapy for "3 hours per day 5 days a week." (R. 479.) His intake exam showed him to be "alert, awake, and . . . oriented x3," and his neurological impression "[r]evealed good comprehension and able to express himself, but dysarthric speech." (R. 481.) His individual plan of care included "[s]peech [therapy] for receptive and expressive evaluation, treatment, dysarthria management." (*Id.*) When Michael was discharged from therapy on August 10, he was noted to have done "very well" and that his "speech improved a great deal." (R. 478.) His discharge instruction included a cardiac diet and outpatient speech, occupation, and physical therapy. (*Id.*)

Michael was seen for an initial evaluation for speech therapy on September 23, 2019. (R. 697.) At the time, Michael rated his speech as impaired, giving it a 5 out of 10. (*Id.*) His

rehabilitative prognosis was "excellent . . . to reach the established goals." (*Id.*) Michael was noted to be "[a]lert and oriented in all spheres" and "cooperative." (*Id.*) At his initial evaluation for his physical and occupation therapy on September 27 (*see* R. 697), his mental status was noted to be "[a]lert and oriented in all spheres—cooperative and motivated." (R. 686.) His chief complaints were "[d]ecreased endurance, [i]ntermittent scuffing of [r]ight foot, [d]ifficulty with stairs—one at a time, difficulty with word finding." (R. 691; *see also* R. 693 ("Patient reports difficulty with word finding and signs of dysarthria.").) He "[r]esponded well to verbal, demonstration, and pictures of instructions," and he was "[a]llow[ed] extra time for communication/word finding, [and] more time to ensure understanding/for processing." (R. 692.) He noted that one of his goals was to "learn how to write again . . . ." (R. 699.) The remainder of the therapy treatment notes do not indicate any mental limitations. (*See generally* R. 700–72.) In his discharge summary from speech therapy, Michael's treatment notes indicate that his "speech clarity continues to be close to baseline, 100% acc to the average listener, however with no impact from the minimal right side facial weakness/asymmetry." (R. 762.)

On October 31, 2019, Michael was admitted to psychiatric care following reports of suicidal thoughts and a "plan to overdose on his medication." (R. 387.) He reported being depressed because "he has not been able to pay his rent, thus he will be evicted soon. He said he had not been able to work since June due to having a stroke in June. . . . He said he usually pays his rent but waiting on his short term disability to be approved." (*Id.*) His mental status exam revealed that he was "awake, alert, oriented X4," his affect was "cong. w/thought content," his attention was "adequate," but his "Insight/Judgment" was "limited/poor." (R. 391.)

Michael was discharged on November 4, and his notes indicate that he had been cooperative and participating in group therapy. (R. 381.) He was noted to be "oriented X 3" with a "normal affect." (R. 383.) His mental status exam revealed that he was alert and oriented X4 with appropriate appearance and a normal/euthymic mood. (R. 502.) He had a "relaxed" psychomotor state, dysarthric speech, "articulate" language, "coherent & goal directed" thought processes, intact short-term memory, adequate attention, and fair insight and judgment. (*Id.*)

At the overwhelming majority of Michael's medical visits, he was found to be alert and oriented with an appropriate affect and no noted mental limitations of any kind. (*See, e.g.*, R. 519 [January 9, 2020], 678 [July 23, 2020], 946 [January 29, 2021], 821 [March 25, 2021], 851 [July 27, 2021; "oriented, cognitive function intact, cooperative with exam, good eye contact, judgement and insight good, mood/affect full range, speech clear, thought content without suicidal ideation, delusions, thought processes logical, goal directed"], 817 [July 28, 2021], 842 [September 28, 2021], 887 [December 1, 2021], 1060 [February 14, 2022; "cerebrovascular disease is stable"], 1023 [February 24, 2022]; 1019 [March 15, 2022]; 1014 [May 24, 2022], 1046 [June 23, 2022; "good judgment and *poor insight*" (emphasis added)], 1076 [August 11, 2022], 1085 [October 3, 2022], 1111 [December 21, 2022; "NEUROLOGIC alert and oriented PSYCH alert, oriented, cognitive function intact, cooperative with exam, good eye contact, judgment and insight good"]].

**C.     Opinion Evidence**

On initial review of Michael's applications, state agency examiners considered evidence from Linda Scott, Ph.D., a psychologist who performed a consultative exam of Michael, wherein she opined that Michael "is not able to complete a normal workday without significant difficulties with memory and concentration. He may also function in the borderline to mild ID [intellectual disability] range. He would also have difficulty relating to coworkers and the public due to his reported irritability, changes in temper control since his stroke. He is not able to tolerate the stress of a competitive work environment." (R. 70, 92; *see* R. 809.) During the consultative exam, Michael reported that "he has some trouble with memory and concentration, which have been worse since the stroke." (R. 76, 98.) The consultative exam noted that "immediate memory was . . . very poor, recent & remote memory was fair. His attention and concentration was noted as quite limited." (*Id.*) Ultimately, the state agency examiner concluded that Michael had moderate limitations in understanding, remembering, or applying information and his ability to concentrate, persist, or maintain pace. (R. 77, 99.) In his assessment of the consistency of Michael's statements regarding his symptoms, the examiner opined that, "Although [Michael] reported some [mental health] symptoms, they appear to be no more than moderate in nature and [Michael] is not seeking MH [mental health] tx [treatment] nor is he rx'd [prescribed] psychotropic medication. [Michael] is seen as partially credible." (R. 80, 102.)

When considering Michael's RFC, the initial examiner opined that Michael was moderately limited in his "ability to understand and remember detailed instructions," his "ability to carry out detailed instructions," his "ability to maintain attention and concentration

for extended periods," and his "ability to sustain an ordinary routine without special supervision." (R. 84, 106–07.) He also believed that Michael had "sustained concentration and persistence limitations," and that he was moderately limited in his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (R. 83, 107.) Ultimately, the state agency examiner determined that Michael could perform light work and was therefore not disabled. (R. 88, 110.)

At the reconsideration level, the state agency examiners noted that Michael had undergone both neurological and psychological consultative exams at the initial review stage, and the examiner stated:

> Although [Michael] attended a psych CE for DDS in 2020 and given a dx of unspecific neurocognitive disorder and persistent depressive disorder, these MDI's are not currently supported by the evidence in file. Neurocognitive disorder was given on the basis of his self reports. When seen by treating providers the claimant has zero psychiatric complaints or limitations.
>
> The claimant does not have a severe mental health impairment—there is no current/active mental health diagnosis. As noted above the claimant previously attended a neurological CE and psychological CE for DDS at the initial level. He did not provide full effort at either IMCE of psych CE. Evidence from 2021 fails to show him reporting memory, cognitive, mental health limitations when seen for medical examinations. PCP records do not contain psych complaints or current/active psychiatric MDI's. Psychiatric portions of his exams are without limitations. He has no cognitive limitations s/p prior stroke and once again, his PCP records are absent of mental health complaints throughout 2021.

(R. 118, 129.) Like the examiners at the initial level, the reconsideration examiners concluded that Michael could perform light work and was therefore not disabled. (R. 123, 134.)

**D.     Relevant Testimony**

In a function report submitted in support of his application, Michael averred that his "ability to handle money changed since the illnesses, injuries, or conditions began," and that his condition affected his "[u]nderstanding," "[f]ollowing instructions," "[m]emory," "[c]ompleting tasks," and '[c]oncentration." (R. 283, 285.)

At a hearing before the ALJ, Michael testified that he lived with his disabled sister and that she did everything for him. (*See* R. 53, 61.) He testified that he graduated high school with a modified diploma after completing the entirety of his schooling in special education. (R. 54–55.) He testified that he cannot read. (R. 54.) He receives food stamps and pays certain household bills, including rent. (R. 62.)

A vocational expert also testified and opined that, given the hypotheticals posed by the ALJ, there were a number of light jobs in the national economy that Michael could perform. (*See* R. 63–67.) On cross examination, Michael's counsel did not add any mental limitations to the hypotheticals posed by the ALJ. (R. 66–67.)

**E.     The ALJ's Opinion**

In the operative decision, the ALJ concluded that Michael suffered from: "a vascular insult to the brain, diabetes mellitus, obesity, hypertension[,] and coronary artery disease."[1] (R. 21.) She found that Michael did not suffer from "an impairment or combination of

---

[1] The ALJ also determined that Michael's other issues—"atrial fibrillation, hyperlipidemia, hypokalemia, dermatitis, history of myocardial infarction (with stent placement), back pain with sciatica, obstructive sleep apnea, unspecific neurocognitive disorder[,] and depressive disorder"—were medically determinable impairments, but they were not severe enough to render him disabled. (R. 21.) Michael does not challenge this determination directly, although by challenging the ALJ's treatment of those consulting examiners who found moderate limitations in some areas (as discussed below), he apparently contends that his non-severe impairments nevertheless hinder his ability to work.

impairments" that met or medically equaled one of the listed impairments in the applicable regulations. (R. 24.) "After careful consideration of the entire record," the ALJ found that Michael had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that [he] can frequently handle and finger with the right, dominant hand. He can frequently push and pull with both the right upper and right lower extremities. He can frequently balance, stoop, kneel, crouch and crawl. He can frequently climb ramps and stairs, and occasionally climb ladders, ropes or scaffolds. [Michael] can tolerate occasional exposure to extreme cold and hazards (such as unprotected heights or machinery with open, moving mechanical parts.

(R. 25.) As a result, the ALJ found that a significant number of jobs exist in the national economy that Michael could perform—such as housekeeping cleaner, locker room attendant, and inspector—and that Michael therefore was not under a disability from June 1, 2019, through the date of her decision. (R. 37–38.)

As is relevant at this stage, the ALJ gave only limited weight to the state agency examiners' opinions. She found the initial examiners opinions—which found that Michael had moderate limitations in the functional areas of "Understand, Remember or Apply Information" and "Concentrate, Persist or Maintain Pace"—to be "only somewhat persuasive" because the opinions "were only somewhat consistent with the record as a whole[,] which shows that the claimant is less limited in the two criteria in which the initial consultant found that the claimant had moderate limitations." (R. 34.) She found the reconsideration examiner's opinions—wherein they concluded that Michael had no mental health limitations—to have "only limited persuasiveness" because her "assertions are supported by her own findings but are only partly consistent with the record as a whole, which the

undersigned finds contain enough evidence to establish that the claimant has medically determinable mental impairments." (*Id.*)

### III. ANALYSIS

Michael challenges the ALJ's opinion on two grounds. First, he contends the ALJ failed to adequately explain her reasoning for giving the opinions of the state agency consultative examiner, Dr. Scott, and the initial state agency examiner less weight and "failing to account for any mental limitations" in his RFC. (Pl.'s Br. at 1.) Second, Michael challenges the ALJ's failure to account for his mathematical and language-developmental limitations in his RFC, and contends that the ALJ erred by finding that he could perform work "despite having the mathematical and language limitations cited above." (*Id.*) The court will address both of these arguments in turn.

A. <u>Medical Opinions</u>

Here, the ALJ determined that Michael did not have any severe mental limitations at Step Two. Rather, she determined that Michael's mental limitations were non-severe and that he had, "at most, mild limitation" in the functional areas of "understanding, remembering or applying information" and "concentrating, persisting or maintaining pace." (R. 21–23.) A non-severe impairment is generally not "expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984). Michael does not challenge this finding directly. Instead, he objects to the explanation given for rejecting opinions that Michael had moderate limitations in those two functional areas.

Under the applicable regulations, medical opinions are not given any specific weight. Rather, ALJs are instructed to review *all* medical opinions—including prior administrative findings—using the factors found in 20 C.F.R. § 404.1520c(c). These factors include supportability, consistency, the relationship between the physician and the claimant (which includes the length of the treatment relationship, frequency of examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and the examining relationship), specialization, and other factors. 20 C.F.R. § 404.1520c(c)(1)–(5). "The most important factors [ALJs] consider when [they] evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability . . . and consistency . . . ." *Id.* § 404.1520c(a).

Michael contends that the ALJ's explanation is cursory and insufficient, likening it to rejecting an opinion with boilerplate language devoid of analysis. *See, e.g.*, *Kristopher C. v. Comm'r of Soc. Sec.*, No. 3:19-CV-5949, 2020 WL 1887960, at *4 (W.D. Wash. Apr. 16, 2020) (holding that an ALJ's finding that a medical opinion was "not consistent with the record as a whole," without more, was error); *Marr v. Berryhill*, No. SA CV 17-01090, 2018 WL 3954734, at *4 (C.D. Cal. Aug. 15, 2018) (same). But the court cannot agree that the ALJ's explanation for rejecting these opinions was "cursory" or "boilerplate." When her opinion is read as a whole, *see Kenne v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018), it is apparent that the ALJ gave numerous reasons for giving the opinions limited weight.

First, her explanation of her decision, while sparse, is not boilerplate:

> The initial consultant . . . found that the claimant had two severe mental impairments. The initial consultant found that the claimant had moderate limitations two of the "B" criteria including "Understand, Remember or Apply Information" and

> Concentrate, Persist or Maintain Pace." In the remaining two criteria, he found that the claimant had no limitation. Those assertions are supported by his own findings which were based on his review of the evidence. However, they are only somewhat consistent with the record as a whole which shows that the claimant is less limited in the two criteria in which the initial consultant found that the claimant had moderate limitations. Therefore, the undersigned finds those portions of the initial consultant's opinion regarding the claimant's mental impairments to be only somewhat persuasive. The initial consultant's remaining assertions are also supported by his own findings but are not fully consistent with the evidence as a whole, which shows that the claimant is less limited than the initial consultant found in the areas of understanding and memory as well as concentration and persistence. Therefore, the undersigned also finds those portions of the initial consultant's opinion to be only somewhat persuasive.

(R. 34.) This analysis considers the two most important factors—supportability and consistency. But more than that, when coupled with the ALJ's explanation for finding Michael only mildly limited in the relevant areas, her full rationale is plainly evident:

> The first functional area is understanding, remembering or applying information. In this area, the claimant has, at most, mild limitation. The record shows that the claimant lives in a house with his disabled sister who he indicated had both mental and physical disabilities. He performs various household chores including washing dishes, sweeping, vacuuming and general cleaning. In addition, he does his own laundry and irons. The claimant also indicated that he travels to another town on a frequent basis. The record indicates that the claimant can care for all his personal needs. In addition, the claimant indicated that he goes outside every day and either walks, rides in a car or uses public transportation to do so. The claimant stated that he watches television a regular basis. He also noted that he talks on the phone daily. The medical evidence shows that the claimant was repeatedly found to be alert and oriented. In addition, it shows that he was found to have good insight and judgment. He was found to have normal thought content as well as logical and goal directed thought processes. Moreover, he was found to have intact cognitive functioning, normal remote memory and clear speech. Further, a consultative examiner . . . found that the

- 15 -

claimant's thought processes were linear and logical and noted that the claimant had appropriate mood and affect. She also found that the claimant to be alert and oriented and to have normal conversational speech which was fluent. Moreover, in another consultative examination . . . , the claimant indicated that he had food stamp income and knew how to manage his own money. That consultative examiner also found that the claimant had appropriate and coherent speech and found that he had intact thought processes. Further, she noted that there was no indication that the claimant had any thought disorders. She found that the claimant was oriented times four and was cooperative. In addition, the doctor indicated that the claimant was able to name the most recent four presidents and also found that he had fairly good social judgment . . . .

. . .

The third functional area is concentrating, persisting or maintaining pace. In this area, the claimant has, at most, mild limitation. The record shows that the claimant lives in a house with his disabled sister. He performs various household chores including washing dishes, sweeping, vacuuming and general cleaning. In addition, he does his own laundry and irons. The claimant also indicated that he travels to another town on a frequent basis. The record indicates that the claimant can care for all his personal needs. In addition, the claimant indicated that he goes outside every day and either walks, rides in a car or uses public transportation to do so. The claimant stated that he watches television a regular basis. He also noted that he talks on the phone daily. The medical evidence shows that the claimant was repeatedly found to be alert and oriented. In addition, it shows that he was found to have good insight and judgment. He was found to have normal thought content as well as logical and goal directed thought processes. Moreover, he was found to have intact cognitive functioning normal remote memory and clear speech. Further, a consultative examiner . . . found that the claimant's thought processes were linear and logical and noted that the claimant had appropriate mood and affect. She also found that the claimant to be alert and oriented and to have normal conversational speech which was fluent. Moreover, in another consultative examination . . . , the claimant indicated that he had food stamp income and knew how to manage his own money. That consultative examiner also found that the claimant had appropriate and coherent speech and also found that he had intact thought processes. Further, she noted that there was no indication that the claimant has any thought disorders. She found

> that the claimant was oriented times four and was cooperative. In addition, the doctor indicated that the claimant was able to name the most recent four presidents and also found that he had fairly good social judgment.

(R. 21–23.) When read "as a whole," the ALJ gave ample reasons—supported by substantial evidence—for her conclusion. Michael's longitudinal records, self-reports, activities of daily living, and other important factors belie the notion that he had the mental limitations he professed. Moreover, his medical records are virtually devoid of complaints relating to the functional limitations he claims to have. These are sufficient and legally valid reasons for rejecting medical opinions, and the ALJ did not err in concluding as she did.

Insofar as Michael challenges the ALJ's decision not to include mental limitations in her RFC, the Commissioner correctly points out that "there is no requirement that the RFC reflect a claimant's non-severe impairments to the extent the ALJ reasonably determines such impairments do not actually create functional limitations on a claimant's ability to work." *Layson v. Comm'r of Soc. Sec.*, No. SAG-17-1183, 2018 WL 2118644, at *2 (D. Md. Feb. 21, 2018). Instead, "an ALJ 'need only include in the RFC those limitations which [she] finds credible.'" *Perry v. Colvin*, No. 2:15-cv-01145, 2016 WL 1183155, at *5 (S.D.W. Va. Mar. 28, 2016) (quoting *Garrett v. Comm'r of Soc. Sec.*, 274 F. App'x 159, 163 (3rd Cir. 2008)). For the reasons discussed above, the ALJ concluded that Michael's mental limitations did not create functional limitations on his ability to work. Citing the lack of supportability in the records for his claimed deficits, the inconsistent nature of the complaints, and activities of daily living that are inconsistent with the level of limitation he claims, the ALJ concluded that it was unnecessary to include additional mental limitations in his RFC. This conclusion is supported by substantial evidence in the record and was not error.

B.      Mathematical and Language Limitations

Michael's second objection is a slight restatement of his first—did the ALJ err in failing to include additional mental limitations in Michael's RFC? For the reasons discussed above, the record contains substantial evidence to support the ALJ's conclusion that Michael's limitations in these areas are not severe and do not impede his ability to perform the range of light work identified at Step Five. For example, although Michael claims he has virtually no math skills (as indicated by his apparent inability to add 3+3 during the consultative exam (R. 808)), he testified that he receives food stamps and pays rent (*see* R. 62), indicating basic mathematical proficiency beyond what he claims. Moreover, the medical evidence simply does not substantiate any additional mental limitations as a result of Michael's stroke. While his speech was affected, therapy notes indicate that he recovered most—if not all—of his abilities in this area, indicating that it was a muscular, not mental, symptom of his stroke. (*See* R. 481 (diagnosing "dysarthric speech")[2].) There is ample evidence to establish that Michael rarely[3] complained to his physicians or therapists that his mental acuity was affected in the months and years after his stroke, suggesting that he retains the same mental limitations he had when he was working prior to his stroke. This supports the ALJs decision not to include additional mental limitations in Michael's RFC.

---

[2] "Dysarthria is a condition in which the part of your brain that controls your lips, tongue, vocal cords, and diaphragm doesn't work well. . . . People with dysarthria can think and understand language. But they have trouble talking because of weakness in the muscles that control speech." Stephanie Watson, *What Is Dysarthria?*, WebMD, https://webmd.com/brain/dysarthria-speech (last visited Mar. 17, 2025).

[3] The court was only able to find scant references throughout the medical records where Michael complained about difficulty with work finding. (*See, e.g.* R. 691, 693.)

- 18 -

The court reiterates that Michael has not objected to the determination that his mental limitations are non-severe. The court also notes that its role is not to reweigh the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Even if the court is inclined to reach a different conclusion, if the ALJ's decision applies the correct law and is supported by substantial evidence, the court must affirm the ALJ's decision. While the court is sympathetic to Michael's condition and has no doubt that he has difficulties, the ALJ's decision is supported by substantial evidence and must be affirmed.

## IV.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision will be affirmed.

**ENTERED** this 17th day of March, 2025.

> */s/ Thomas T. Cullen*
> HON. THOMAS T. CULLEN
> UNITED STATES DISTRICT JUDGE